In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-2012

HOOPS, LP and HEISLEY MEMBER, INC., Tax Matters Partner,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

_____

Appeal from the United States Tax Court
No. 11308-18.

_____

ARGUED JANUARY 19, 2023 — DECIDED AUGUST 9, 2023

_____

Before BRENNAN, SCUDDER, and KIRSCH, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Hoops LP seeks a $10.7 million tax deduction for deferred compensation that it owed to two of its employees at the close of the 2012 tax year. Under 26 U.S.C. § 404(a)(5), an accrual-based taxpayer like Hoops can only deduct deferred compensation expenses in the tax years when it pays its employees or contributes to certain qualified plans, such as a trust or pension fund.

Hoops did not do either, however. Instead in 2012 the firm sold substantially all its assets and liabilities. As part of the transaction, the buyer assumed Hoops's $10.7 million deferred compensation liability. Hoops viewed this $10.7 million amount as a deemed payment to the buyer to compensate it for assuming the deferred compensation obligation. So Hoops took a tax deduction under Treasury Regulation § 1.461-4(d)(5)(i) on its 2012 partnership return, claiming the buyer's assumption of the $10.7 million liability as an ordinary business expense deductible at the time of sale.

The Internal Revenue Service denied the deduction, and the Tax Court upheld the disallowance. The Tax Court determined that § 404(a)(5) of the Tax Code barred Hoops from claiming a deduction for deferred compensation in the 2012 tax year because the firm did not pay the employees during that year. We agree and affirm.

# I

## A

Hoops is a limited partnership that formed in 2000 to acquire a National Basketball Association franchise, the Vancouver Grizzlies, which later became the Memphis Grizzlies. In October 2012 Hoops sold the Grizzlies to Memphis Basketball, LLC. At that time Hoops owed two players, Mike Conley and Zach Randolph, deferred compensation for their strong performance in the 2009, 2010, and 2011 seasons. Conley and Randolph accrued $12.6 million in total deferred compensation for those seasons, which Hoops promised to pay sometime after 2012. But Hoops never paid the deferred compensation to either player. Instead, as part of the asset sale, Memphis Basketball assumed Hoops's liability for the $12.6 million

owed to them. Hoops later calculated the liability to be $10.7 million at its discounted present value.

In computing its gain on the 2012 sale, Hoops reported to the IRS that it realized $419 million in the transaction, of which Memphis Basketball paid $200 million in cash and assumed $219 million in liabilities. See 26 C.F.R. § 1.1001-1. Included in the liabilities was the $10.7 million (discounted) deferred-compensation obligation. In Hoops's view, Memphis Basketball's assumption of the obligation to pay Conley and Randolph was reflected in the purchase price: Memphis Basketball paid Hoops $10.7 million less because it undertook Hoops's liability. Stated yet another way, Hoops believed that the $10.7 million was a "deemed payment" it made to Memphis Basketball to compensate it for the deferred compensation that remained owed to the two players.

B

In September 2013 Hoops filed Form 1065, its partnership tax return, for the 2012 tax year, using the accrual method of accounting. Hoops made no reference to the $10.7 million deferred-compensation liability that the buyer had assumed in the 2012 sale.

The following month Hoops filed Form 1065X, an amended partnership tax return, for the 2012 tax year. On this amended return, Hoops claimed a $10.7 million deduction for the deferred compensation owed to Conley and Randolph. Hoops believed that Treasury Regulation § 1.461-4(d)(5)(i) permitted an acceleration of the $10.7 million deduction to the date of the sale.

In a final partnership administrative adjustment letter issued in 2018, the IRS disallowed the $10.7 million deduction.

Hoops, through its tax matters partner, then petitioned the Tax Court for review.

C

The Tax Court upheld the IRS's disallowance, homing in on 26 U.S.C. § 404(a)(5), which governs the deductibility of deferred compensation to nonqualified plans. Because the claimed deduction reflected deferred compensation that Hoops had not paid to a qualified trust or pension plan, the Tax Court explained that § 404(a)(5), by its plain terms, precluded Hoops from taking the deduction until the players were paid.

The Tax Court also rejected Hoops's position that Treasury Regulation § 1.461-4(d)(5)(i) allowed it to accelerate the deduction to the year of the asset sale to Memphis Basketball. Section 461 of the Tax Code and its implementing regulations, the Tax Court explained, direct accrual-method taxpayers to look first to other relevant provisions of the Code before applying the timing provision. In following that direction here, the Tax Court determined § 404(a)(5) to be the applicable Code provision governing the plan Hoops had for deferred compensation owed to Conley and Randolph. Following the rule set forth in § 404(a)(5), then, the Tax Court determined that § 404(a)(5)'s specific deferred-compensation provision prevailed over the regulation in § 1.461-4(d)(5)(i), and that Hoops therefore could not take the deduction in 2012.

Hoops now appeals.

## II

### A

Taxpayers can generally deduct all ordinary and necessary business expenses paid or incurred during the tax year, including employee salaries. See 26 U.S.C. § 162(a)(1). For accrual-based taxpayers like Hoops, these expenses are usually deductible during "the taxable year in which all the events have occurred that establish the fact of the liability, [when] the amount of the liability can be determined with reasonable accuracy and economic performance has occurred." 26 C.F.R. § 1.461-1(a)(2); see also 26 U.S.C. § 461(a), (h). As a practical matter, this means accrual-based taxpayers can normally deduct employment related expenses as employees render services. This differs from the cash method of accounting, which allows taxpayers to make deductions only at the time the taxpayer pays the expense. See 26 U.S.C. § 461(a); 26 C.F.R. § 1.461-1(a)(1). So accrual-method taxpayers tend to take their deductions sooner than cash-method taxpayers because many taxpayers make payments after services are rendered.

A different set of rules addresses deductions for employee compensation paid pursuant to a deferred-payment plan. In a separate provision of the Tax Code, § 404, Congress provided that employers may claim deductions for deferred compensation as employee services are rendered only if compensation is paid pursuant to a qualified plan that meets certain requirements, such as holding the funds in trust. See 26 U.S.C. § 404(a)(1)–(4). Employers that do not pay deferred compensation into and pursuant to a qualified plan cannot claim deductions until the compensation is actually paid and

"includible in the gross income of employees" participating in the plan. *Id*. § 404(a)(5).

Notice the effect § 404(a)(5)'s deductibility timing direction has on the application of ordinary accrual rules. While § 404 applies equally to taxpayers regardless of accounting method, it effectively instructs all employers using deferred compensation plans to use cash accounting. That is so because § 404(a)(5) allows employers to take their deductions only when they contribute to qualified plans (by making payments for services rendered) or when they pay the compensation. See *id.*

By regulating deferred compensation plans this way, Congress "create[d] financial incentives for employers to contribute to qualified plans while providing no comparable benefits for employers who adopt plans that are unfunded." *Albertson's, Inc. v. Comm'r*, 42 F.3d 537, 543 (9th Cir. 1994). Congress gave accrual-method employers a choice. On one hand, they can contribute deferred-compensation payments to a qualified plan and take deductions as they make these payments. On the other hand, employers can forego the costs of a qualified payment plan, with the tradeoff that they may not take any deduction until they make the payments to their employees (past or present). In this way, § 404(a)(5) establishes what we might call a "matching rule" between employee and employer, where Congress intended for employers to deduct deferred compensation expenses and employees to report income in the same tax year. See *id.*

B

It is against this backdrop that Hoops filed its Form 1065X for the 2012 tax year claiming a $10.7 million deduction for

the deferred-compensation liability that Memphis Basketball assumed in the 2012 sale. Everyone agrees that if the sale of the Grizzlies never happened, § 404(a)(5) would have prevented Hoops from claiming the deduction in 2012 because no payments had been made to a qualified plan or to the two players. The question we must answer, then, is this: Did Hoops's sale, and Memphis Basketball's assumption of its liability, change the tax treatment of the $10.7 million in deferred compensation under the otherwise clear rule Congress supplied in § 404(a)(5)?

Hoops contends that it did. The partnership points to a separate part of the Tax Code, § 461, and its implementing regulation in § 1.461-4(d)(5)(i), to claim that an earlier deduction was permitted even though the deferred compensation was not paid in 2012 to either Mike Conley or Zach Randolph. Remember that Hoops uses the accrual method of accounting. For ordinary business expenses, that means Hoops cannot claim an expense deduction until "economic performance" occurs. 26 U.S.C. § 461(h)(1). When it comes to services generally, economic performance occurs as services are provided (for example, as a building is cleaned, painted, or repaired). See *id.* § 461(h)(2)(A)(i). The same is generally true for employee services—that economic performance occurs as an employee works, provided all other Tax Code provisions and Treasury Regulations are followed, including § 404(a)(5). See 26 C.F.R. § 1.461-4(d)(2). By playing in the 2009, 2010, and 2011 basketball seasons, Conley and Randolph rendered employment services meeting the economic performance requirement of § 461(h)(2)(A)(i), thus deductions follow so long as they are paid, as required by § 404(a)(5). See *id.*

According to Hoops, the economic performance requirement is important here because still another rule governs the deduction of liabilities assumed as part of an asset sale. Hoops relies on Treasury Regulation § 1.461-4(d)(5)(i), which provides the following:

> If, in connection with the sale or exchange of a trade or business by a taxpayer, the purchaser expressly assumes a liability arising out of the trade or business that the taxpayer but for the economic performance requirement would have been entitled to incur as of the date of the sale, economic performance with respect to that liability occurs as the amount of the liability is properly included in the amount realized on the transaction by the taxpayer.

26 C.F.R. § 1.461-4(d)(5)(i).

Hoops believes that the phrase "but for the economic performance requirement" in § 1.461-4(d)(5)(i) is expansive. Everyone agrees Hoops could not deduct the deferred compensation liability in 2012 because of § 404(a)(5). By viewing § 404(a)(5) and its deductibility timing limitation as an economic performance requirement, then, Hoops insists that § 1.461-4(d)(5)(i) allows it to accelerate that deduction regardless of whether the players have been paid, as otherwise required by § 404(a)(5). To Hoops, the specific context of the asset sale—and therefore Treasury Regulation § 1.461-4(d)(5)(i)—trumps all other considerations, even the uncontested factual point that the underlying obligation is one for deferred compensation under § 404(a)(5).

The Tax Court rejected Hoops's view of the interaction between § 404(a)(5) and Treasury Regulation § 1.461-4(d)(5)(i). The starting point for the Tax Court was 26 U.S.C. § 461(h), which sets forth general deductibility rules for accrual-method taxpayers. Walking through that provision and its regulations, the Tax Court observed that the parties agreed all requirements for deduction were met, including economic performance, in 2012. But from there the Tax Court reasoned that Hoops could not take a deduction until addressing any other "[a]pplicable provisions of the Code, the Income Tax Regulations, and other guidance published by the Secretary" that "prescribe the manner in which a liability that has been incurred is taken into account." 26 C.F.R. § 1.461-1(a)(2)(i). The Tax Court then identified § 404(a)(5) as one such applicable provision of the Code controlling Hoops's deduction of the deferred-compensation liability. Because § 404(a)(5) disallowed the deduction until the tax year in which Conley and Randolph received payment, the Tax Court affirmed the IRS's final partnership administration adjustment letter denying the deduction.

C

After taking our own fresh look at the Tax Code, we agree with the Tax Court that Hoops cannot take the $10.7 million deduction in the 2012 tax year. See *Freda v. Comm'r*, 656 F.3d 570, 573 (7th Cir. 2011). Section 404(a)(5) leaves us with a firm conviction of Congress's intent to treat the deductibility of deferred-compensation salary plans differently than ordinary service expenses—and that this special treatment prevails over any general provisions otherwise applicable to liabilities assumed in asset sales. Tax deductions are a matter of legislative grace. See *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79,

84 (1992). As the party seeking the deduction, Hoops fell short of proving entitlement to the $10.7 million deduction in 2012. See *id.*

On appeal Hoops contends, as it did in the Tax Court, that the acceleration provision in Treasury Regulation § 1.461-4(d)(5)(i) renders the economic performance requirement that it sees as embedded with § 404(a)(5) as satisfied in a way that allowed Hoops to take the $10.7 million deduction for deferred compensation in 2012. In making this argument, Hoops urges us to recharacterize the $10.7 million amount as a "deemed payment" made to Memphis Basketball in the asset-sale transaction and not as a deferred-compensation liability. By doing so, Hoops contends that the amount is an ordinary business expense deductible in 2012, when Conley and Randolph rendered their services and Hoops implicitly paid for those services in setting the sale price to Memphis Basketball. We are not persuaded.

We begin with Hoops's claim that Treasury Regulation § 1.461-4(d)(5)(i) controls over § 404(a)(5) of the Tax Code. The parties agree that a faithful interpretation of the Tax Code requires specific provisions to prevail over general ones. See *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) ("A specific provision controls one of more general application."); see also *Bloate v. United States*, 559 U.S. 196, 207 (2010) (same). In reviewing the statute and its regulations, we see more evidence in the text supporting the Commissioner's view that § 404(a)(5)'s specific regulation of nonqualified deferred-compensation plans must prevail over § 1.461-4(d)(5)(i)'s broader treatment of assumed liabilities in connection with the sale of businesses more generally.

Taking a closer look at § 404 of the Tax Code and Treasury Regulation § 1.461-4(d)(5)(i) shows us that the plain and highly specific direction supplied by § 404(a)(5) resolves this case. The statute uses mandatory language and itself provides a controlling rule. Start with the general rule that "if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation *shall* not be deductible under this chapter." 26 U.S.C. § 404(a) (emphasis added). The statute goes on to list the exceptions and limitations, including for employees paid by nonqualified plans. For those employees, an employer specifically cannot take a deduction until "the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan." *Id.* § 404(a)(5).

Now compare that language with the Treasury Regulation that Hoops believes controls. By its terms, § 1.461-4(d)(5)(i) accelerates only those deductions that a taxpayer cannot take because the economic performance requirement has not been met. But we have already explained that under § 461(h) economic performance of services occurs as employees render them. Therein lies the fundamental flaw in Hoops's argument: it was not § 461(h)'s economic performance requirement that prevented Hoops from taking the deduction in 2012, but the rule in § 404(a)(5) governing nonqualified deferred-compensation plans. Hoops's decision not to pay the players in 2012 and its decision not to contribute to a qualified plan precluded its ability to claim the deduction that same tax year. Hoops cannot assert that either of these are economic performance barriers as that term is defined in 26 U.S.C. § 461(h)—but that is what Hoops would need to prove to show that the acceleration provision of Treasury Regulation

§ 1.461-4(d)(5)(i) applies. We cannot agree with Hoops that the definition of economic performance sweeps broadly enough to include the specific, deferred-compensation provision in § 404(a)(5).

There is more. Treasury Regulation § 1.461-4(d)(2)(iii) states that "the economic performance requirement is satisfied to the extent that any amount is otherwise deductible under section 404 (employer contributions to a plan of deferred compensation)." The express reference—in conditional terms—to § 404 further defeats Hoops's position. By its terms, the regulation tells us that economic performance is satisfied and liabilities are therefore deductible if the other requirements of § 404 are also met. In this way, the regulation expressly directs taxpayers to return to § 404 before confirming that a deduction is available under the acceleration provision, showing the emphasis placed on taxpayers meeting § 404(a)(5)'s specific requirements for amounts owed under nonqualifying deferred compensation plans.

Note too the absence of any reference in § 404 to the asset-sale provisions in § 461. Under § 404(a)(5), Congress allowed a deduction for deferred compensation "in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan." The implementing regulation, Treasury Regulation § 1.404(a)-12(b)(1), provides further that deductions are permitted "only in the taxable year of the employer in which or with which ends the taxable year of an employee in which an amount attributable to such contribution is includible in his gross income as compensation, and then only to the extent allowable under section 404(a)." Neither provision contains an exception for asset sales, nor do they reference § 461 and accrual

method accounting. These observations reflect and give effect to Congress's clear intent in passing § 404 in the first place—to displace the accrual method with an approach that requires employers to choose between qualified plan payments and earlier deductions. Hoops gives us no reason to believe that Congress allowed employers to get out of this choice by selling their liabilities and claiming them as ordinary business expenses.

Hoops's insistence on calling the assumed deferred compensation a "deemed payment" loses sight of the substance of what transpired. No question it sold its assets, and the transaction entailed Memphis Basketball assuming a liability. But not just any liability—instead, a liability for deferred compensation based on services already rendered by two players in prior seasons. And, as we have explained, it is this "substance of [the] transaction [that] is more important than its form." *Illinois Power Co. v. Comm'r*, 792 F.2d 683, 689 (7th Cir. 1986); see also *Jacobs v. Comm'r*, 45 T.C. 133, 135 (1965). Had no sale occurred, Hoops could not have deducted the $10.7 million in deferred compensation owed the two players because they were not paid in 2012. The reason for that outcome has nothing to do with the operation of the economic performance rule, though: indeed, both players had played in past seasons and thereby earned the deferred compensation. Rather, what would disallow the deduction in the no-sale circumstance is the limitation Congress imposed in § 404(a)(5) on Hoops's decision not to contribute to a qualified plan and not to pay the players before the sale. And, so too, on the actual facts: it is § 404(a)(5) and not anything about the asset sale or economic performance rule that precludes the deduction in the 2012 tax year.

Given Conley and Randolph were not paid their deferred compensation in 2012, the plain text of § 404(a)(5) instructs that Hoops cannot take a deduction for that liability in that tax year. We see no basis, in the Tax Code or its regulations, to deviate from this clear rule.

D

Hoops also urges us to consider the practical implications of our interpretation. Even though Hoops could claim a deduction in the tax year when Conley and Randolph are ultimately paid, the firm contends that there is a possibility it could lose the deduction altogether—for example, if the buyer never pays the players or otherwise fails to communicate that the players were paid. Hoops believes such a result is inequitable.

Perhaps so. But any risk of losing the deferred-compensation deduction is foreseeable, especially given the clear instructions from Congress in § 404(a)(5). We agree with the Commissioner's suggestion that Hoops could have avoided this tax-deduction problem in many ways—by adjusting the sales price to reflect the deductibility, contributing to qualified plans for the players to take earlier deductions, or renegotiating the players' contracts and accelerating their compensation to the date of the sale. Simply put, parties can, and do, account for tax risk as an economic matter by negotiating contractual provisions to minimize and compensate for such financial contingencies. This case presents no reason to conclude otherwise, especially given Congress's direct and specific regulation of deferred compensation.

With these closing observations, we AFFIRM.